UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | No. 3:20-cr-00128 (VLB) |
| v. | : | |
| | : | |
| SEAN THOMAS and VASHTI | : | September 17, 2021 |
| JONES, | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION DENYING
DEFENDANTS' MOTIONS TO SUPPRESS, [ECF NOS. 51, 52, 53]

Sean Thomas and Vashti Jones have been charged with possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi).[1] [ECF No. 1 Counts I (Thomas) and III (Thomas and Jones)]. Thomas is also charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), [ECF No. 1 Count II], and Jones is charged with maintaining a drug involved premises in violation of 21 U.S.C. §§ 856(a)(1) and 856(b). [ECF No. 1 Count IV]. Before the Court are Defendants' motions to suppress drugs, drug proceeds, a firearm, and other items found during a police search of Ms. Jones' residence on June 3, 2020. See [ECF Nos. 51, 52, 53 (Mots. to Suppress)]. Thomas and Jones argue that the search was unconstitutional because the police performed an improper "protective sweep" prior to seeking a search warrant. During the "protective sweep" police spied potential drugs and drug paraphernalia in plain view, and added this information to the search warrant affidavit, but because the "protective sweep" was unconstitutional, that information

---

[1] Jones is also charged in Count III with violating 18 U.S.C. § 2(a), which states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

should not have been added to the search warrant application because it was "fruit of the poisonous tree."  Without it, the search warrant authorizing the search lacked probable cause.  Thus, drugs, proceeds and other items seized during the search should be inadmissible.  *Id.*  Jones also argues that the search warrant affidavit omitted key information which, if included, would have demonstrated a lack of probable cause to search.  Because of these material omissions, therefore, the search warrant application was fatally deficient and did not provide probable cause for the search.  [ECF No. 52].  The Court DENIES Defendants' motion to suppress for the reasons explained below.

   I.   Factual Background

   The Court recounts the following facts derived from the exhibits attached to Defendants' Motions—the Search Warrant authorizing the search of Jones' residence and the affidavit supporting it, a police report describing the events in question, an FD-302a describing the items seized from Jones' apartment, as well as a diagram and photographs of Jones' apartment.  *See* [ECF Nos. 51-1, 52-3—52-14 (Mots. to Suppress Exhibits)].

   During the month of May 2020, Hartford Police received information from a confidential informant ("CI") that Sean Thomas, Elijah Levy, and Clement Kelly were involved in the unlawful distribution of fentanyl and marijuana.  [ECF No. 51-1 (Thomas Mot. To Suppress Exhibit A (Search Warrant Application Affidavit) ("Aff.") ¶ 7].  The CI described Levy and Thomas as the "big dogs" who were obtaining kilogram quantities of fentanyl and marijuana and Kelly as their "middle man" who was selling fentanyl on the streets.  *Id.*  The CI stated that Levy owned the Vibe 'N Smoke shop at 85 Airport Road in Hartford, which was a "front" from which Kelly sold marijuana and laundered money.  *Id.*  Thomas owned "Puff Paradise," located at 18 New Britain Avenue, Hartford, which was a

"front" from which Thomas sold marijuana and laundered money. *Id.* The CI also stated that Thomas, Levy, and Kelly used 158-160 Bushnell Street in Hartford to store drugs and firearms. *Id.*

The CI had been registered with the Hartford Police Department ("HPD") as a confidential informant for two months and had previously provided information to investigators about individuals involved in illegal narcotics trafficking and unlawful firearms possession, which investigators were able to independently corroborate. *Id.* ¶ 8. At that time, the CI had multiple narcotics related charges pending in Connecticut Superior Court and cooperated with law enforcement "with the expectation of receiving favorable consideration on those charges." *Id.*

The CI said Thomas' girlfriend Vashti Jones drove a red Toyota Corolla and resided with Thomas in Rocky Hill. The CI said Thomas trusted very few people and kept illegal drug proceeds at the residence. The CI stated that if they located Jones, they would locate Thomas and his drug proceeds. *Id.* ¶ 9.

After obtaining this information, law enforcement verified Jones' residence at 300 Cold Spring Road, Rocky Hill, using a law enforcement database and using information from a Source of Information ("SOI") who had been providing information to law enforcement for more than two years. Law enforcement also verified using a Connecticut Department of Motor Vehicles database that Jones had a 2010 red Toyota Corolla registered in her name. *Id.* ¶¶ 10-11.

On May 26, 2020, in the morning, investigators set up surveillance at 300 Cold Spring Road. At 12:08 p.m., Thomas was observed walking toward a parked 2019

Chrysler 300, entering the vehicle and driving away from the apartment complex.  At 12:28 p.m., Thomas arrived at Puff Paradise.  *Id.* ¶ 13.

The same day an undercover ("UC") law enforcement officer, equipped with an audio/video recording device, purchased $60 worth of marijuana from an unidentified male at Puff Paradise.  A field test of the substance tested positive for marijuana.  *Id.* ¶ 14.

The next day, May 27, 2020, the same UC officer, again equipped with recording equipment, purchased $50 worth of marijuana at Puff Paradise, which field-tested positive once again.  *Id.* ¶ 15.  Based on the two controlled marijuana purchases, the HPD obtained State of Connecticut search warrants for Puff Paradise at 18 New Britain Avenue in Hartford, Vibe 'N Smoke at 85 Airport Road in Hartford, and 158-160 Bushnell Road in Hartford.  *Id.* ¶ 16.

Investigators again set up surveillance at 300 Cold Spring Road on the morning of June 2, 2020.  *Id.* ¶ 17.  At 3:47 p.m., law enforcement observed Thomas walk from the apartment building containing Jones' apartment to the parked 2019 Chrysler 300, holding a multi-colored bag in his right hand.  Thomas entered the Chrysler and then drove out of the apartment complex towards Hartford.  *Id.*

Thomas proceeded to the area of 54 Kenneth Street in Hartford and parked.  A short time later, Thomas was observed standing outside his vehicle and talking to several unidentified males.  *Id.* ¶ 18.  A gray Dodge Durango with Florida license plates arrived and parked behind Thomas' Chrysler.  Thomas walked to the passenger side of the Florida vehicle and entered it.  Police closed in driving unmarked vehicles, but were identifiable as police officers, at which point the Florida vehicle sped off at a high rate of

speed, causing detectives to jump out of the way to prevent them from being struck by the Durango.  *Id.*; [ECF No. 52-10 (HPD Police Report) at 3].  The Durango drove onto the sidewalk and turned right into the driveway of 54 Kenneth Street at a high rate of speed.  Aff ¶ 18.  The vehicle drove through a chain link fence in the rear of 54 Kenneth Street, drove through another chain link fence on the next property then crashed into a tree located in the rear of 44-46 Kenneth Street.  *Id.*; HPD Police Report at 3.

The driver of the Durango, later identified as Tafarie Green, a known convicted felon, exited the vehicle and began running away over a fence ignoring police commands to stop and get on the ground.  Aff. ¶ 19; HPD Police report at 4.  Thomas exited the vehicle, placed his hands in the air, warned police that he was legally carrying a firearm, sat down, and then lay on the ground in a prone position.  Aff. ¶ 19; HPD Police Report at 4.  In the vehicle, police observed on the front passenger side floor a large clear knotted plastic bag containing a beige powdery substance.  The plastic bag was partially open and some of the powdery substance was scattered around.  Next to the bag was a red wireless phone, and on the front driver's side floor mat was a black handgun.  The beige powdery substance weighed approximately 124 grams and field-tested positive for fentanyl.[2]  Thomas was arrested on state drug possession and possession with the intent to sell narcotics charges.  Aff. ¶ 19; HPD Police Report at 4.  Both the firearm Thomas carried, and the firearm found on the driver's side floor were determined to be fully operational each with a live round in the chamber.  HPD Police Report at 4.  Thomas'

---

[2] It is undisputed that a subsequent DEA lab report established that the powdery substance did not contain any controlled substance.  [ECF Nos. 51-1 at 4 n.1, 52-1 at 5, 57 at 17 n.2].

firearm also had six rounds in its magazine, and the firearm found on the driver's side floor had eight rounds in its magazine. *Id*. at 5-6.

Police searched Thomas' Chrysler and found, on top of the center console, $788 in what appeared to be the same multi-colored bag Thomas had carried to the Chrysler earlier that day. Aff ¶ 20. Police also found two plastic containers with a green plant-like substance that field-tested positive for marijuana (less than ½ ounce), a clear plastic bag containing storage unit type keys with a card with "unit 21" and "*21508#" written in pen, and several mobile telephones. HPD Police Report at 5.

Green was a known drug trafficker who was on federal supervised release following completion of a 60-months prison sentence for conspiracy to distribute narcotics. Aff. ¶ 21.

On June 2, 2020, police also executed the state search warrants for Puff Paradise at 18 New Britain Avenue in Hartford, Vibe 'N Smoke at 85 Airport Road in Hartford, and 158-160 Bushnell Road in Hartford. *Id.* ¶ 22. At Puff Paradise, investigators found approximately three pounds of marijuana, over $6,000 in U.S. currency, and an Eversource document addressed to "Sean Thomas, 18 New Britain Avenue, Hartford, CT 06106-3305." *Id.* ¶ 23.

On June 2, 2020, investigators also went to 300 Cold Spring Road, apartment C508. *Id.* ¶ 24. Upon arrival, they knocked loudly on the door while announcing "Police." Jones answered the door on the chain, and when the police identified themselves, she said she had to secure her dog. She did so, then shut the door, and reopened it, allowing law enforcement into her apartment. *Id.* Investigators asker her if anyone else was in the apartment and she answered her cousin was also present. Investigators could see Jones'

cousin from the front door.  [ECF No. 52-5 (photo of cousin from front door area)].  Police made a protective sweep of the apartment "to locate the cousin and any other person, as well as in anticipation of applying for a search warrant."  Aff. ¶ 24.  Upon opening an unlocked bedroom door, police saw a folding table near a bedroom window.  On top of the table were four cardboard boxes and a white powder residue.  *Id.*

Jones was asked to consent to a search of the apartment, but she refused.  *Id.* ¶ 25.

Law enforcement then applied for a search warrant to search the apartment, which was granted by the Honorable Robert A. Richardson, United States Magistrate Judge. [ECF Nos. 52-13, 52-14].

Upon searching Jones' apartment, law enforcement found the following items:

- Four Ziploc bags containing 97 grams of suspected fentanyl

- One grey plastic bag containing 37 grams of suspected fentanyl

- Five Ziploc bags containing residue and trace amounts of suspected fentanyl

- 13 plastic bags containing 63.9 grams of suspected fentanyl

- Approximately 230 wax paper sleeves containing 44.3 grams of fentanyl (total)

- Five knotted plastic bags each containing U.S. currency in the amounts of $3,002, $2,313, $3,067, $4,729, and $3,400 for a total of $15,511.

- One plastic bag in freezer containing 68.7 grams of an unknown rock-like substance

- One backpack containing a scale, mannitol, a knife, two spoons, and several blenders all with residue

- **Another backpack containing another scale, drug paraphernalia, seven boxes of empty wax paper sleeves, one wooden rolling pin, and a blender cup**

- **One Magic Bullet blender box containing one blender with residue and 12 cardboard boxes with empty wax paper sleeves**

- **One cardboard box containing four bars of a cutting agent called mannite cicogna**

- **Six boxes containing wax paper sleeves and rubber bands**

- **One firearm registration for Sean Thomas**

- **One black Ruger LCP .380 caliber firearm**

- **One Smith & Wesson gun pouch containing one empty firearm magazine of unknown caliber**

- **One black plastic bag containing 32.8 grams of suspected fentanyl**

- **One knotted plastic bag containing approximately 1,437 wax paper bags containing 344.9 grams of suspected fentanyl**

- **One Ziploc freezer bag containing approximately 1,165 wax paper sleeves containing 302.6 grams of suspected fentanyl**

- **Two clear knotted plastic bags containing 34.5 grams of suspected fentanyl**

- **Three knotted plastic bags and approximately 1,260 wax paper sleeves containing 312.9 grams of suspected fentanyl**

- **One magic bullet blender cup containing 219.5 grams of suspected fentanyl**

- **One digital scale with a metal sifter and miscellaneous packaging material/paraphernalia with trace evidence**

**[ECF No. 51-1 (Thomas Exhibit D (FD-302a) at 2-9)]**

Prior to the search commencing, Sean Thomas, who had been released from state custody, arrived.  *Id.* at 9.  Law enforcement asked him if they would find anything, and he responded in the affirmative and stated, "whatever they find is mine."  *Id.*  After the search was complete, investigators read Thomas his *Miranda* rights and attempted to ask him some questions, but he refused.  *Id.*  Jones likewise refused to answer any questions. *Id.*

## II.    Legal Standard

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *Id*.

Probable cause is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted).  "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules."  *Id.* at 232.  "In assessing the proof of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically."  *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).  "Courts do not isolate each factor of suspicion but instead look to the totality

of the circumstances." *United States v. Gagnon*, 337 F.3d 230, 236 (2d Cir. 2004) (citing *Gates*, 462 U.S. at 230-31).

A court reviewing the issuance of a search warrant "accord[s] 'great deference' to a judge's determination that probable cause exists[] and . . . resolve[s] any doubt about the existence of probable cause in favor of upholding the warrant." *Salameh*, 152 F.3d at 113. The court's "duty is 'simply to ensure that the magistrate had a substantial basis for . . . conclud[ing]' probable cause existed." *Id.* at 113 (quoting *Gates*, 462 U.S. at 238-39). "[T]he resolution of doubtful cases . . . should be largely determined by the preference to be accorded to warrants." *United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998) (internal quotation marks omitted); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) (in doubtful cases, probable cause is more easily sustainable where a judicial officer authorized warrant). "A reviewing court should not interpret supporting affidavits in a hypertechnical, rather than a commonsense manner." *Id.* (internal quotation marks omitted).

Probable cause requires more than generalized suspicion, *United States v. Ceballos*, 654 F.2d 177, 185 (2d Cir. 1981), but "does not require a *prima facie* showing" of criminality. *United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005). Nor does probable cause mean more likely than not; rather, it only requires a "probability or substantial chance of criminal activity." *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990); *see also United States v. Juwa*, 508 F.3d 694, 710 (2d Cir. 2007). "The fact that an innocent explanation may be consistent with the facts as alleged, however, does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

In instances where evidence is "seized pursuant to a warrant for which actual probable cause does not exist or which is technically deficient," the evidence nevertheless "is admissible if the executing officers relied on the warrant in 'objective good faith.'" *United States v. Canceimo*, 64 F.3d 804, 807 (2d Cir. 1995) (quoting *United States v. Leon*, 468 U.S. 897 (1984)).  This exception to the exclusionary rule recognizes that "the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'"  *Id.* (quoting *Leon*, 468 U.S. at 919); *see also Herring v. United States*, 555 U.S. 135, 144 (2009) (application of the exclusionary rule limited to "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence").

One exception to the warrant requirement is when exigent circumstances exist. *United States v. Zabare*, 871 F.2d 282, 289 (2d Cir. 1989).  "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *United States v. MacDonald*, 916 F.2d 766, 770 (2d Cir. 1990).  Examples of exigent circumstances "include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Carpenter v. United States*, 138 S. Ct. 2206, 2223 (2018) (citing *Ky. v. King*, 563 U.S. 452, 460 n.3 (2011).

Another exception to the search warrant requirement is the "protective sweep." *Maryland v. Buie*, 494 U.S. 325, 327 (1990) ("A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places

in which a person might be hiding."). Before conducting a protective sweep police "must believe, based on specific and articulable facts, that the area to be swept harbors a person posing a danger to those present before making the warrantless search." *United States v. Blue*, 78 F.3d 56, 59 (2d Cir. 1996)). The use of a protective sweep is not confined to those situations incident to arrest. *See United States v. Miller*, 430 F.3d 93, 98-99 (2d Cir. 2005) (joining other Circuits in holding for the first time that "[t]he Court's paramount concern in *Buie* was not why the officers were present in the home, but rather, why the officers might fear for their safety and what they could do to protect themselves. Buie's logic therefore applies with equal force when officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant.") (citing *Buie*, 494 U.S. at 333).

III.   Discussion

    A.   Defendants' Motions to Suppress Based on Faulty Protective Sweep

    Defendants move to suppress the drugs and other items found during the search of Jones' residence because the "protective sweep" police conducted before applying for the search warrant was fatally deficient. From Thomas' memorandum:

> Only if police possessed the kind of 'specific and articulable facts' that warranted a reasonable belief that someone in the apartment posed a danger to the police, could they have arguably justified the limited and cursory inspection to dispel that concern.
> Law enforcement agents had been provided with no information anyone other than the defendant and his girlfriend lived at the apartment. Neither of these individuals had a prior criminal history. In fact, agents had been informed by their confidential informant that Mr. Thomas *trusted very few people.* Furthermore, Mr. Thomas' girlfriend was cooperative with police in that she informed the agents that her cousin was also present in the apartment. The cousin was sitting on the living room couch, which was both visible and mere steps from the foyer of the apartment where agents were standing. Moreover, nowhere in the police reports and/or affidavits was there an indication that agents heard sounds emanating from the

apartment's interior to suggest that someone else might be hiding in the apartment.  Moreover, the totality of the evidence in this case suggests that police had no good faith belief that anyone in the apartment might be in imminent harm, or that evidence might be destroyed.  Notwithstanding this lack of information, the agents nonetheless proceeded to conduct a protective sweep throughout the entirety of the apartment, including closed bedroom doors, under the pretext they were looking for other individuals.

[ECF No. 51-1 at 14-15 (emphasis in Defendant Thomas' memorandum)].  From Jones'

memorandum:

No exigent circumstances were present that would justify law enforcement's warrantless search of Ms. Jones' home.  There was no indication anyone was attempting to destroy evidence. . . . [T]here was no imminent endangerment of any person in the home.  At the time the police entered Ms. Jones' home, neither she nor her cousin were 'suspects' or making any attempt to flee.  There is no indication in the police paperwork that law enforcement believed exigent circumstances were present.  They cannot now manufacture exigent circumstances to justify their search.

The only information law enforcement had here was uncorroborated information from an unreliable CI that Mr. Thomas trusted Ms. Jones and would likely keep money at her apartment.  The two co-conspirators described by the CI were not connected to the apartment nor was their criminal activities as alleged by the CI corroborated.  The apartment was nine miles from where the arrests occurred and original search warrants were served.  Mr. Thomas was in custody and his phone seized long before police arrived at Ms. Jones' apartment.  Ms. Jones was not a target of the investigation and police did not intend to arrest her when they went to her apartment.  Nowhere in the police reports and Affidavit does it say officers heard noises suggesting that someone else might be hiding in the apartment or trying to destroy evidence.  Notwithstanding this information, the agents proceeded to search throughout the entirety of the apartment, including behind closed bedroom doors, and in containers to look for other individuals.
. . .
In this case, the [search warrant] affiant justified the protective sweep to the Court as follows: 'to locate the cousin and any other person, as well as in anticipation of applying for a search warrant.'  As stated above, the cousin was visible to officers in the living room area.  Moreover, the stated justification does not satisfy the requisite foundation for a protective sweep, 'the belief that the area to be swept harbors an[] individual posing a danger to those on the scene.'

[ECF No. 52-1 at 8, 11-12 (citations omitted)].

Defendants continue that "[t]he police violated the Fourth Amendment when they swept through Ms. Jones' home in search of people and 'in anticipation of applying for a search warrant.' The alleged contraband seized during that search should be suppressed." *Id.* at 12 (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). "Furthermore, the items discovered during that search were then a critical element of the affidavit of probable cause when the officers sought approval of a search warrant for Ms. Jones' home. Therefore, any evidence seized pursuant to that warrant is fruit of the initial Fourth Amendment violation and thus must also be suppressed." *Id.* at 12 (citing cases). "Ruling such evidence inadmissible at trial effectuates the 'commands of the Fourth Amendment,' deters police misconduct, and safeguards 'the integrity of the judicial process.'" *Id.* at 12-13.

Defendant Jones also argues that the search warrant application affidavit omitted certain facts, lacked independent verification by police of several facts stated by the CI, and included unreasonable conclusions; it therefore lacked probable cause she argues. *Id.* at 14. Facts alleged by the CI lacking verification include:

- "Elijah Levy, Sean Thomas, and Clement Kelly were involved in the unlawful distribution of fentanyl and marijuana. . . . These remain bald assertions by the CI with no independent corroboration. This lack of corroboration [wa]s never disclosed to the independent magistrate." *Id.* at 16.

- "Levy and Thomas are 'big dogs' who obtain kilogram quantities and Kelly is the 'middle man.' . . . These remain bald assertions by the CI with no independent corroboration. This lack of corroboration [wa]s never disclosed to the independent magistrate." *Id.* at 16.

- "Levy owns Vibe 'N Smoke Shop . . . from which Levy sold marijuana.  None of this information is ever corroborated. . . . In fact, reference is made . . . to the issuance and execution of a search warrant for Vibe 'N Smoke . . . but it is omitted whether any evidence of controlled substance sales is discovered to corroborate the information provided by the CI.  These express omissions fail to corroborate the veracity of the CI's information.   Moreover, their intentional omission to the independent magistrate was made intentionally with reckless disregard to the truth in the submission of the Affidavit.  This information tends to weigh against a finding of probable cause."   *Id.* at 17.

Other omissions include Thomas' non-presence when the two drug buys at Puff Paradise were made, the failure to note the results of the execution of the search warrant at 158-160 Bushnell, where Levy, Thomas, and Kelly allegedly stored drugs and firearms, the fact that 300 Cold Spring Road is an apartment building with 544 units "and that Thomas is never observed coming from apartment C508," and the omission of the fact that Thomas was not charged with possession of a firearm, among others.  *Id.* at 17-23. Defendant Jones sums up: "Where an affiant with reckless disregard for the truth submits an affidavit that omits information necessary to the finding of probable cause a violation of the Fourth Amendment has occurred."  *Id.* at 24 (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2nd Cir. 1993)).  "In this case, the submitted Affidavit is replete with omissions regarding unsuccessful corroboration of the information provided by the CI.  While the Affidavit is written in a manner to imply successful corroboration, further inquiry which requires examination of other investigations and live testimony reveals that little if any successful corroboration was achieved."  *Id.*  Therefore, according to Defendant Jones,

"[t]he Affidavit submitted in request for a search warrant omitted salient facts that challenged the reliability and veracity of the CI, and did not present probable cause to the magistrate, and thus violated Ms. Jones' Fourth Amendment protections in the security of her home." *Id.* at 26.

The Court notes that it is well-settled that application of the exclusionary rule "has always been our last resort, not our first impulse" as "[t]he exclusionary rule generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)). Moreover, "the exclusionary rule is not an individual right and applies only where it results in appreciable deterrence. In addition, the benefits of deterrence must outweigh the costs. To the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against its substantial social costs. Accordingly, to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *In re 650 Fifth Ave.*, 934 F.3d 147, 162 (2d Cir. 2019) (citations omitted). Exclusion of evidence is particularly inappropriate "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920 (1984). In such cases, "an officer is [not] required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984); see also *United States v. Romain*, 678 F. App'x 23, 25 (2d Cir. 2017) (same).

"[Searches] pursuant to a warrant will rarely require any deep inquiry into reasonableness … for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search."  *Leon*, 468 U.S. at 922 (internal quotation marks and citations omitted).  "Such reliance, however, must be objectively reasonable."  *United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016) (citing *Leon*, 468 U.S. at 922-23)).   "Thus, to assert good faith reliance successfully, officers must, inter alia, disclose all potentially adverse information to the issuing judge." *Ganias*, 824 F.3d at 221.

There are four circumstances in which a police officer's reliance on a search warrant would not be reasonable: (1) where the magistrate was misled by information that the officer knew was false or would have known was false but for his reckless disregard for the truth; (2) the magistrate abandoned his judicial role; (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was so facially deficient that the officers could not have reasonably believed it was valid.  *Leon*, at 923.  *See also United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (same).

Finally, "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."  *Leon*, 468 U.S. at 918.

In the Court's view, the police reasonably relied on the search warrant signed by Judge Richardson, because the search warrant affidavit in the application disclosed the potentially negative information about which Defendants complain.  For example, the affidavit included information about the protective sweep police conducted that same

day: "Investigators asked JONES if anyone else was present in the apartment.  JONES responded that her cousin was also present.  At this time, investigators conducted a protective sweep of the apartment to locate the cousin and any other person, as well as in anticipation of applying for a search warrant.  Upon opening an unlocked bedroom door, investigators observed a folding table near the bedroom window.  Sitting on top of this folding table was four small cardboard boxes along with a white powder residue." Aff. ¶ 24.   Judge Richardson authorized the search warrant after considering this information, and neither defendant suggests that Judge Richardson did anything untoward in doing so.  It was, therefore, eminently reasonable for the police to rely on the properly authorized search warrant, supported as it was by the 14-page, 31-paragraph affidavit.

As to Defendant Jones' suggestion that the affiant, recklessly disregarding the truth, intentionally omitted material information from the affidavit that would have borne negatively in Judge Richardson's analysis had it been included, the Court disagrees. First, confidential informants who have a track record of supplying information that is later independently corroborated by law enforcement are generally considered reliable. *See*, *e.g.*, *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007) ("Where informants are known . . . a lesser degree of corroboration is required" and "a proven track record of providing reliable tips may serve to bolster an informant's veracity . . . ."). An informant who has provided "consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause."  *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993); *see also Adams v. Williams*, 407 U.S. 143, 147 (1972) (police may rely on

information provided by a confidential informant to establish probable cause where the information "carrie[s] enough indicia of reliability to justify the officer's [reliance].").

Here, not only had the CI's information previously been independently verified, but *in this case* he provided information that independent investigation showed was correct; namely, that Thomas' girlfriend's name was Vashti Jones, that she drove a red Toyota Corolla, that she lived in Rocky Hill, that Thomas owned Puff Paradise and used it to sell marijuana and launder money, that Thomas kept drug proceeds at Jones' apartment, that Levy used Vibe 'N Smoke to sell marijuana, [ECF No. 57 at 15], and other information.  In light of this, Jones' argument that not every bit of information provided by the CI was independently corroborated is unavailing.

Moreover, any alleged omissions would either have been obvious to Judge Richardson, or, if included, would have bolstered his finding that there was probable cause for the search.  For example, Defendant Jones alleges that:

> Levy, Thomas, and Kelly used 158-60 Bushnell Street, Third Floor, Hartford, to store drugs and firearms.  Reference is made to the issuance and execution of a search warrant for 158-60 Bushnell Street, Third Floor, Hartford.  However, no mention is made whether any evidence of drugs and firearms or link to Levy, Thomas, and Kelly is discovered during that search to corroborate the information provided by the CI.  Had there been corroborative evidence it would have been included in the Affidavit.  The omission of this lack of corroboration was never provided to the independent magistrate for consideration.  This information weighs against a finding of probable cause.

[ECF No. 53 at 18-19].  In fact, "the search of 158-160 Bushnell resulted in the seizure of two firearms and copious amounts of narcotics, paraphernalia, and packaging material." [ECF No. 57 at 14].  The Government argues that "[h]ad that 'omitted' information been included in the affidavit, it would have only buttressed the CI's reliability."  *Id.*  The Court agrees.

Other allegations of material omission are similar.  For example, Defendant Jones alleges that:

> Levy owns Vibe 'N Smoke Shop located at 85 Airport Road, Hartford, from which Levy sold marijuana.  None of this information is ever corroborated.  In fact, reference is made in ¶16 and ¶22 to the issuance and execution of a search warrant for Vibe 'N Smoke at 85 Airport Road but it is omitted whether any evidence of controlled substance sales is discovered to corroborate the information provided by the CI.  These express omissions fail to corroborate the veracity of the CI's information.  Moreover, their intentional omission to the independent magistrate was made intentionally with reckless disregard to the truth in the submission of the Affidavit.  This information tends to weigh against a finding of probable cause.

[ECF No. 53 at 17 (citing *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 826 (2d Cir. 2014))].

In fact, "[h]ad the Levy information been included in the search warrant affidavit, it would have read that an undercover office made marijuana buys from Levy's smoke shop (just as the UC did from Puff Paradise) and that when the search warrant was executed an employee confirmed to investigators that Levy owned the shop, and that marijuana was being sold illegally from the shop."  [ECF No. 57 at 15].  The Government argues that "[t]his alleged 'omission' would have bolstered the CI's credibility."  *Id.*  Again, the Court agrees.  As mentioned, other allegations of omitted material facts are similar, or would have been obvious to Judge Richardson, who could have quizzed the affiant if he had questions before he authorized the search warrant.  In sum, Defendant Jones' allegation that the affiant's material omissions amount to a reckless disregard of the truth simply does not hold up under scrutiny.

As to the legitimacy of law enforcement's warrantless search of Jones' apartment, the Court agrees with Defendants that the cursory search was not authorized under either the exigent circumstances doctrine to "prevent the imminent destruction of evidence," *Carpenter*, 138 S. Ct. at 2223 (citing *King*, 563 U.S. at 460 n.3), or as a protective sweep.

Defendants are correct that law enforcement heard no sounds emanating from non-visible portions of Jones' apartment, that the justification for the protective sweep in the search warrant application affidavit was lacking or misleading, [ECF No. 53-1 at 8 (warrantless search justified "to locate the cousin and any other person, as well as in anticipation of applying for a search warrant") (quoting Aff. ¶ 24)], and that the facts known to law enforcement did not justify their warrantless search to either (i) ensure that the drugs later found in Jones' apartment were not destroyed, or (i) ensure law enforcement's safety while at Jones' apartment.

The Government argues that:

At the point when investigators arrived at Jones' apartment, the investigators knew the following:

- Thomas had just been arrested on State charges in constructive possession of a large amount of suspected fentanyl.
- Thomas was in a car with a felon and known drug trafficker.
- That felon had attempted to flee from the police and left in the car a firearm.
- Corroborated information from an established and reliable confidential informant that Thomas kept drug proceeds in the apartment he shared with Jones.
- Corroborated information that marijuana was sold from Thomas' smoke shop.
- Thomas left the Rocky Hill apartment building earlier that afternoon with $788 in currency.

After Thomas' arrest, investigators went to Cold Spring Road to secure the location for the purpose of obtaining a search warrant, unless consent could be obtained. Even though Thomas was arrested, he could have called Jones, or posted bond, and returned to the apartment. In fact, Thomas did post bond and went to Cold Spring where he encountered investigators who were awaiting a search warrant. Moreover, the CI had reported that Thomas was involved in high-level narcotics activity with other criminal associates. Clement was a multi-time felon with convictions for firearms and narcotics offenses. The search of the Bushnell Street address, discussed above, resulted in the seizure of guns and drugs, but no one was present in the apartment and neither Clement nor Kelly were located. The coordinated searches of the two smoke shops, the Bushnell Street apartment, Green's escape from police on Kenneth Street, and Thomas' arrest provided ample

notice to Thomas' criminal associates of his arrest and therefore the need to preserve the removal or destruction of evidence from Cold Spring was paramount. . . . Investigators were correct to believe that once Jones knew of Thomas' arrest and law enforcement's interest in searching the apartment, she could not be left alone in the apartment where she could have readily disposed of the drug evidence. Investigators also knew that Thomas was in possession of a pistol when he was arrested in Hartford and possessed a valid pistol permit. Given the obvious intersection of drug trafficking and guns, it was reasonable for them to conduct a protective sweep to ensure that there was no one who presented a danger to them while they waited in the apartment.

[ECF No. 57 at 20-21]. The Court disagrees, because law enforcement had no evidence whatsoever that Green, Levy, and Kelly were at the Jones' apartment and they knew that Thomas was *not* inside, as he showed up and was detained *outside* the apartment; the Government's argument is, therefore, speculative, and law enforcement is not empowered to conduct warrantless searches when the basis for such a search is not established. *United States v. Segura*, 663 F.2d 411, 415 (2d Cir. 1981) (warrantless search unlawful when law enforcement heard no sounds emanating from apartment and "[t]hey had no reasonable belief that anyone was in the apartment."). In this scenario, a warrantless search to ensure drug evidence was not being destroyed, or for the safety of law enforcement, was improper in the face of an absence of evidence even hinting that either scenario was likely.

However, even if the warrantless search of Jones' apartment law enforcement conducted was improper, and the evidence found in plain view, consisting as it did of four boxes and a white powder residue, are excised from the search warrant application affidavit, the application still provided ample probable cause for the search of Jones' apartment. "[I]t is well established that '[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the

warrant.'" *United States v. Peeples*, 962 F.3d 677, 688 (2d Cir. 2020) (quoting *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)).  "To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that '. . . the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'" *United States v. Canfield*, 212 F.3d 713, 717-18 92d Cir. 2000) (quoting *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998)).  Thereafter, the defendant must show that "after setting aside the falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause." *United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005) (citing *Franks v. Del.*, 438 U.S. 154, 171-72 (1978)). *See also Canfield*, 212 F.3d at 718 ("Once the inaccurate information has been removed from the affidavit, the remaining portions of the affidavit should be reviewed de novo to determine if probable cause still exists").

Even without the information regarding the boxes and white powder residue found at Jones' apartment, the affidavit contained ample evidence supporting probable cause to search Jones' apartment.  First, the affidavit contained information from a CI whose veracity had been independently assessed in other cases and in this case, that Thomas used Jones' apartment to store drug proceeds.  That information was validated when Thomas was observed carrying a multi-colored bag from the building containing Jones' apartment to his Chrysler, a bag that later was found to contain $788 after Thomas was observed associating with a known drug dealer, who fled the crime scene, and after Thomas was arrested for drug possession and possession with the intent to sell narcotics.  Second, the affidavit contained information that Thomas owned Puff Paradise and used it as a front to sell marijuana and launder money; when searched pursuant to a

state search warrant, investigators discovered more than three pounds of marijuana and over $6,000 in cash there.  Third, the day Thomas was observed carrying the multi-colored bag was the second day Thomas was observed proceeding from the Jones apartment building to his Chrysler; on the first day he was tracked proceeding to Puff Paradise after which a UC officer illegally purchased marijuana at Puff Paradise.  Given these facts alone, Judge Richardson had more than an adequate basis to issue the search warrant for a search of Jones' apartment, a search that was richly rewarded when investigators discovered over one kilogram of suspected fentanyl, $15,511 in cash, and a second firearm.  [ECF No. 51-1 (FD-302a describing results of search)].

In sum, and considering the deference accorded to judicial officers who make probable cause search warrant authorization determinations in the first instance, *see Ventresca*, 380 U.S. at 109 (in doubtful cases, probable cause is more easily sustainable where judicial officer authorized the search warrant), the Court finds that there was probable cause for a reasonable person to conclude that Defendant could have been storing drugs, drug proceeds, or other contraband at Jones' apartment, even without the discovery from the prior warrantless search.

Moreover, Defendants do not question whether Judge Richardson acted appropriately in granting the application for a search warrant in this case, and the law enforcement members who executed the search warrant did so, as far as the record indicates, with objective good faith.  Defendants also take no exception with this.

## B.  Evidentiary Hearing

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable

the court to conclude that contested issues of fact going to the validity of the search are in question.'"  *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quoting *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979)).  "[A] defendant seeking to suppress evidence bears the burden of demonstrating disputed issues of fact that would justify an evidentiary hearing."  *United States v. Diaz*, 303 F. Supp. 2d 84, 93 (D. Conn. 2004) (citing *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969)).  Further, a defendant seeking a hearing must submit "an affidavit of someone alleging personal knowledge of the relevant facts."  *United States v. Barrios*, 210 F.3d 355, 2000 WL 419940, at *1 (2d Cir. Apr. 18, 2000) (citing *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967)).

Here, there are no "contested issues of fact going to the validity of the search" that might justify an evidentiary hearing.  *Pena*, 961 F.2d at 339; *Diaz*, 303 F. Supp. 2d at 93.  Thus, no hearing on Defendants' motions to suppress is necessary.

IV.  <u>Conclusion</u>

For the foregoing reasons, the Court DENIES Defendants' Motions to Suppress.

IT IS SO ORDERED.

Vanessa Bryant  Digitally signed by Vanessa Bryant
Date: 2021.09.17 17:14:40 -04'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 17, 2021**